UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 12/17/2025
```

------------------------------------------------------------------------X
: 
AZIZULLAH QASEMI,                          :
:
                    Petitioner,            :
:                     25-cv-10029 (LJL)
         -v-                               :
:                     OPINION AND ORDER
LADEON FRANCIS, et al.,                    :
:
                    Respondents.           :
:
------------------------------------------------------------------------X

LEWIS J. LIMAN, United States District Judge:

Petitioner Azizullah Qasemi has petitioned the Court for a writ of habeas corpus under 28

U.S.C. § 2241. For the following reasons, the Petition is granted.

## BACKGROUND

Petitioner Azizullah Qasemi is a 29-year-old national of Afghanistan. Dkt. No. 1 (the

"Petition") ¶ 1. In Afghanistan, Qasemi was a teacher. Dkt. No. 14-1 (Declaration of Azizullah

Qasemi, or "Qasemi Decl.") ¶ 2. He fled Afghanistan for the United States after being subjected

to forced eviction and death threats from the Taliban. Petition ¶ 19. He has never been charged

with any crime anywhere in the world. Qasemi Decl. ¶ 3. Upon his arrival at the U.S. border,

Qasemi made an appointment through the Customs and Border Patrol ("CBP") One application

in place in 2024 and received an appointment for May 5, 2024. Petition ¶ 21. On May 8, 2024,

he was issued a Notice and Order of Removal form, which explained that under 8 U.S.C. §

1225(b)(1), he was inadmissible pursuant to 8 U.S.C. § 1182(a)(7)(A)(i)(I) as a noncitizen "who

is not in possession of a valid unexpired immigrant visa, reentry permit, border crossing

identification card, or other valid entry document required by this chapter." Dkt. No. 10

(Declaration of Julio Bracho, or "Bracho Decl.") ¶ 4; *see* Dkt. No. 9-2 (Notice of Order of Expedited Removal).

On the basis that he expressed a fear of returning to Afghanistan, Qasemi was held for referral to an asylum officer for a credible fear determination. Bracho Decl. ¶ 4. Pending his credible fear interview, Qasemi was detained in the San Luis Regional Detention Center and the Imperial Regional Adult Detention Facility. *Id.* ¶ 5. He received his credible fear interview on May 30, 2024, at which the asylum officer determined that he had established credible fear. *Id.* ¶ 6. He was therefore referred to an Immigration Judge to pursue his asylum application through removal proceedings under Section 240 of the Immigration and Nationality Act ("INA"). *Id.* Accordingly, Qasemi was served with a Notice to Appear ("NTA") on May 21, 2024, charging him as inadmissible pursuant to 8 U.S.C. § 1182(a)(7)(A)(i)(I), and directing him to appear before an Immigration Judge on June 11, 2024. Bracho Decl. ¶ 7; Dkt. No. 9-3 (NTA). Petitioner remained in detention following the determination that he established a credible fear of returning to Afghanistan. Bracho Decl. ¶ 7.

Petitioner appeared for his Immigration Court calendar hearing, which was adjourned at his request until August 22, 2024, so that he could find and retain legal representation. *Id.* ¶¶ 9–11. Qasemi appeared with an attorney on August 22 and admitted the factual allegations and conceded the charge of removability. *Id.* ¶ 12. He applied for asylum on September 20, 2024. Qasemi Decl. ¶ 11; Bracho Decl. ¶ 13. Petitioner again appeared in Immigration Court on September 26, 2024, but at request of counsel his master calendar hearing was adjourned until October 24, 2024. Bracho Decl. ¶ 14. At the October 24 hearing, the matter was adjourned until March 18, 2025, for an individual merits hearing. *Id.* ¶ 15.

On November 6, 2024, Immigration and Customs Enforcement ("ICE") served Petitioner with an Interim Notice Authorizing Parole, thereby releasing him from detention.  *Id.* ¶ 16.  That notice stated that ICE "has decided to parole you from its custody pursuant to its authority under section 212(d)(5)(A) of the Immigration and Nationality Act."  Dkt. No. 9-4 at 2.  The Interim Notice continued that the authorization "is valid for one year beginning from the date on this notice and will automatically terminate upon your departure or removal from the United States or at the end of the one-year period unless ICE provides you with an extension at its discretion.  ICE may also terminate parole on notice prior to the automatic termination date.  Parole is entirely within the discretion of ICE and can be terminated at any time and for any reason."  *Id.*  The notice was dated November 6, 2024.  *Id.*  The Assistant Field Office Director explained along with the notice that Petitioner was released because he posed "neither a flight risk nor danger to the community."  *Id.* at 3.  When he received the paperwork, Petitioner did not know that the status was valid for only one year, because he did not speak English and no interpreters or translators were present.  Qasemi Decl. ¶ 13.

After his release from custody, Petitioner began a life in New York.  *Id.* ¶ 17.  He lived with his brother, sister-in-law, and nephews.  *Id.*  He worked at a restaurant in Queens, studied English at Columbia University's Community Impact English as a Second Language Program, received his driver's permit, and completed a security guard training program.  *Id.* ¶ 18.  As required under the conditions of his parole, Petitioner attended check-ins with the Intensive Supervision Appearance Program ("ISAP").  *Id.* ¶ 19.  On December 16, 2024, Petitioner failed to check-in with ISAP as required.  Bracho Decl. ¶ 19.  Qasemi attempted to correct the mistake the next day but was unable to as the window for the check-in had closed.  Qasemi Decl. ¶¶ 24– 27.  There was no follow up from ICE regarding the missed appointment.  *Id.* ¶ 25.  In October

of 2025, Petitioner's merits hearing on his pending asylum application was rescheduled in

Immigration Court for February 26, 2026.  Bracho Decl. ¶ 22.  His case was consolidated with

that of his brother, sister-in-law, and two nephews, who fled Afghanistan for the same reasons.

Qasemi Decl. ¶ 16.

On December 2, 2025, Petitioner attended an ISAP check-in at 7 Elk Street, New York,

New York.  Petition ¶ 25.  He was accompanied by his attorney to the office but was required to

meet with the ICE officer alone.  Qasemi Decl. ¶ 34.  Qasemi was provided with a Dari

interpreter, scheduled for an additional ISAP check-in, and permitted to leave.  *Id.* ¶ 35.  The

officer said nothing about any further check-ins that day.  *Id.*  Later the same day, Qasemi was

notified that he was required to attend an ICE check-in at 26 Federal Plaza in Manhattan.  He

immediately made his way toward 26 Federal Plaza, where upon arrival he was once again

separated from his legal team.  *Id.* ¶ 43.  After he entered the ICE waiting room on the 5th floor,

he was apprehended by ICE officers.  Petition ¶ 26.  His attorneys were denied an opportunity to

speak with him.  *Id.*  Upon entering the ICE office, Qasemi's hands and legs were chained

together without warning.  Qasemi Decl. ¶ 47.  He was arrested pursuant to an I-200 Warrant of

Arrest of Alien.  Bracho Decl. ¶ 24; *see* Dkt. No. 9-5.  His belongings, including his wallet and

phone, were taken from him.  Qasemi Decl. ¶ 47.  Petitioner was detained at 26 Federal Plaza for

one day, where he was kept in a cold room with little food.  *Id.* ¶¶ 48–49.  He was transferred to

the ICE Delaney Hall Facility the next day, December 3, 2025.  *Id.* ¶ 50.[1]  According to

Petitioner, since arriving at Delaney Hall, he has been denied requests for Halal meals and is

frequently hungry.  Dkt. No. 18-1 ¶¶ 12–16 (Supplemental Qasemi Declaration, or "Suppl.

Qasemi Decl.").

---

[1] The Parties do not dispute that venue is appropriate in this Court.

## PROCEDURAL HISTORY

Petitioner submitted his Petition for a writ of habeas corpus on December 3, 2025.  Dkt.

No. 1.  On December 4, 2025, this Court issued an Order scheduling a conference for December

5, 2025, and instructing the parties to confer and attempt to reach an agreement on how the Court

should handle the petition.  Dkt. No. 4.  Following that conference, the Court ordered that the

Government respond to the Petition by December 10, 2025, and Petitioner to submit any reply by

December 11, 2025.  Dkt. No. 5.  It also scheduled a conference on the Petition for December 12,

2025.  *Id.*

The Government submitted its brief on December 10, 2025, along with a declaration of

Deportation Officer Julio Bracho and five exhibits.  Dkt. Nos. 9–11.[2]  Petitioner submitted his

reply, along with a declaration and three exhibits, on December 11, 2025.  Dkt. Nos. 14–15.  The

Court held a hearing on December 12, 2025.  Although the Court had ordered that the Petitioner

be produced at the hearing, the Government informed the Court that they had been unable to

locate the Petitioner at his detention facility, and that he would not appear in time for the

scheduled hearing.  In his supplemental declaration, Qasemi explains that although he alerted

officers at the facility frequently the morning of the hearing that he was to be transported to

Court, his requests were not heeded.  Suppl. Qasemi Decl. ¶¶ 4–11.

The Government filed an additional letter as requested by the Court at the December 12

conference on December 16, 2025.  Dkt. No. 17.  Petitioner filed a supplemental memorandum

of law in reply on December 17, 2025, along with six exhibits.  Dkt. Nos. 18–19.[3]

---

[2] The Court had ordered that the Government respond to the Petition by 6:30 p.m. on December
10, 2025.  The Government did not file its brief until 7:11 p.m.  With the Petitioner's consent,
the Government submitted a letter motion on December 11 requesting that the Court grant an
extension of time *nunc pro tunc*, Dkt. No. 13, which was granted, Dkt. No. 16.

[3] The supplemental memorandum of law is not responsive to the limited purpose for which it was
solicited by the Court at the hearing on December 12, 2025.  The Court therefore declines to

**LEGAL STANDARD**

Qasemi brings a petition for a writ of habeas corpus under 28 U.S.C. § 2241, which "authorizes a district court to grant a writ of habeas corpus whenever a petitioner is 'in custody in violation of the Constitution or law or treaties of the United States.'" *Wang v. Ashcroft*, 320 F.3d 130, 140 (2d Cir. 2003) (quoting 28 U.S.C. § 2241(c)). "Federal courts have jurisdiction to hear habeas corpus claims by noncitizens challenging the constitutionality of their detention." *Lopez v. Sessions*, 2018 WL 2932726, at *6 (S.D.N.Y. June 12, 2018) (citing *Denmore v. Kim*, 538 U.S. 510, 516–17 (2003)).

**DISCUSSION**

Petitioner argues that his detention is invalid under the INA and its implementing regulations and under the Due Process Clause of the Fifth Amendment.

**I.    Statutory Background**

To understand his current position, it is first important to understand the statutory framework that governs Qasemi's presence as a noncitizen in the United States. Upon his arrival as a noncitizen without any valid entry documentation, Qasemi was deemed inadmissible under 8 U.S.C. § 1182(a)(7)(A)(i)(I). Under that section, a noncitizen is inadmissible if they are "not in the possession of a valid unexpired immigrant visa, reentry permit, border crossing identification card, or other valid entry document required by this chapter." *Id.* Accordingly, as a noncitizen who arrived at the United States but who "had not been admitted," Qasemi was "an applicant for admission." 8 U.S.C. § 1225(a)(1).

A noncitizen who arrives at the border or a port of entry and is found to be inadmissible under 8 U.S.C. §§ 1182(a)(6)(C) or (a)(7) and who satisfies either of two relevant criteria is

---

consider its contents, and will consider only the attached declarations.

subject to expedited removal and mandatory detention under Section 1225(b)(1). The two criteria are that the noncitizen be (1) "arriving in the United States" or (2) "described in clause (iii)" of that section. 8 U.S.C. § 1225(b)(1)(A)(i). If a noncitizen does not fall into either of those two categories, they are not subject to mandatory detention under that subsection. *Id.* If those criteria apply, "the examining immigration officer shall create a record of the facts of the case and statements made by the alien," the examining immigration officer "shall advise the alien of the charges against him or her on Form I–860, Notice and Order of Expedited Removal, and the alien shall be given an opportunity to respond to those charges in the sworn statement." 8 C.F.R. § 235.3(b)(2)(i).

If, during that process, the "alien subject to the expedited removal provisions indicates an intention to apply for asylum, or expresses a fear of persecution or torture, or a fear of return to his or her country, the inspecting officer shall not proceed with further removal of the alien until the alien has been referred for an interview by an asylum officer." *Id.* § 235.3(b)(2)(4). The noncitizen "shall be detained pending a final determination of credible fear of or of persecution and, if found not to have such fear, until removed." 8 U.S.C. § 1225(b)(1)(B)(iii)(IV). If, as in Qasemi's case, the asylum officer determines that the noncitizen does have a credible fear of persecution or torture, or a credible fear of return to their country, U.S. Citizenship and Immigration Services ("USCIS") has "complete discretion" to either issue a Notice to Appear for full consideration of the asylum claim in Section 240 proceedings or to "retain jurisdiction over the application for asylum." 8 C.F.R. § 208.30(f). "Parole of the alien may be considered only in accordance with section 212(d)(5) of the Act and 8 C.F.R. § 212.5." *Id.*

In this case, following his credible fear interview, Petitioner was issued a Notice to Appear, thereby removing the case from USCIS and scheduling an asylum hearing before an

immigration judge.  Bracho Decl. ¶ 7.  Petitioner was thus removed from the process for

expedited removal and placed into the "usual removal process" under Section 240, codified at 8

U.S.C. § 1229a.  *Dep't of Homeland Sec. v. Thuraissigiam*, 591 U.S. 103, 108 (2020).  Section

240 proceedings involve an evidentiary hearing before an immigration judge in which a

noncitizen may "attempt to show that he or she should not be removed."  *Id.*  In Section 240

proceedings, noncitizens have a right to hire counsel, to a reasonable opportunity to examine

evidence against them, to present evidence on their own behalf, and to cross-examine any

Government witnesses.  8 U.S.C. § 1229a(b)(4)(A)–(B).

Upon passing his credible fear interview and beginning proceedings under Section 240

rather than expedited removal, the implementing regulations of the INA state that Qasemi's

detention remained mandatory on account of his status as an arriving alien.  *See* Dkt. No. 9-1

(Notice to Appear listing Qasemi as an arriving alien).  "Any arriving alien who appears to the

inspecting officer to be inadmissible, and who is placed in removal proceedings pursuant to

section 240 of the Act shall be detained in accordance with section 235(b) of the Act.  Parole of

such alien shall only be considered in accordance with § 212.5(b) of this chapter."  8 C.F.R. §

235.3(c)(1).[4]

The doctrine of immigration parole is an exception to the otherwise mandatory nature of

detention for noncitizens within the scope of Section 1225(b)(1).  Under that doctrine, even a

---

[4] Section 1225(b)(1) itself is ambiguous as to the terminal point of mandatory detention.
Subsection (b)(1)(B)(ii) states that "[i]f the officer determines at the time of the interview that an
alien has a credible fear of persecution . . . the alien shall be detained for further consideration of
the application for asylum."  That language might be understood to require only that detention is
mandatory if DHS retains jurisdiction over the application, in which case it "shall conduct" an
asylum interview itself "within 45 days of the applicant being served with a positive credible fear
determination."  8 C.F.R. § 208.9(a)(1).  The Supreme Court held in *Jennings v. Rodriguez* that
the "plain meaning of" that phrase "is that detention must continue until immigration officers
have finished considering the application for asylum."  583 U.S. 281, 299 (2018).

noncitizen applicant for admission who falls into the category of those that "shall" be detained may be permitted to cross into the United States and live in the country with relative freedom pending further immigration proceedings. 8 U.S.C. § 1182(d)(5)(A). The statute clarifies that "[t]he Secretary of Homeland Security may . . . in his discretion parole into the United States temporarily under such conditions as he may prescribe only on a case-by-case basis for urgent humanitarian reasons or significant public benefit any alien applying for admission to the United States, but such parole of such alien shall not be regarded as an admission of the alien and when the purposes of such parole shall, in the opinion of the Secretary of Homeland Security, have been served the alien shall forthwith return or be returned to the custody from which he was paroled and thereafter his case shall continue to be dealt with in the same manner as that of any other applicant for admission to the United States." *Id.* The accompanying regulations clarify that parole may be granted only where the noncitizen "presents neither a security risk nor a risk of absconding." 8 C.F.R. § 212.5(b).

Petitioner was paroled in November 2024 under Section 1182(d)(5)(A) after ICE determined that he was neither a flight risk nor a danger to the community. Dkt. No. 9-4 at 3. Noncitizens paroled into the United States under 8 U.S.C. §1182(d)(5)(A) are permitted to apply for employment authorization. 8 C.F.R. § 247a.12(c)(11). Petitioner obtained permission to work and got a job. With that freedom, Qasemi additionally enrolled in English courses, obtained professional training, and spent time with his family—all while awaiting his Immigration Court hearing on the merits of his pending asylum application, which would determine whether he could stay in the United States as a lawful permanent resident or would be removed.

## II.     Detention Under the Immigration and Nationality Act

According to the Government, Petitioner's parole status terminated automatically on November 6, 2025—one year after it was granted, as was stated in the parole documents provided to the Petitioner upon his release from detention.  Dkt. No. 9-4 at 2 ("Your parole authorization is valid for one year beginning from the date on this notice and will automatically terminate upon your departure or removal from the United States or at the end of the one-year period unless ICE provides you an extension at its discretion.")  The implementing regulations of the INA state that "Parole shall be automatically terminated without written notice . . . at the expiration of the time for which parole was authorized."  8 C.F.R. § 212.5(e)(1)(ii).  Petitioner does not dispute that his parole status has ended.  He did not apply for, nor was he unilaterally granted, an extension of parole.

The parties disagree as to consequences of the end of Petitioner's parole and how it relates to Petitioner's subsequent arrest and detention in December 2025.  The Government argues that because of the termination of Petitioner's parole he is subject to mandatory detention and can be arrested at any time without notice.  Dkt. No. 11 at 2.  It relies on the language of the statute that, "when the purposes of such parole shall, in the opinion of the Secretary of Homeland Security, have been served the alien shall forthwith return or be returned to the custody from which he was paroled and thereafter his case shall continue to be dealt with in the same manner as that of any other applicant for admission to the United States."  *Id.* at 10 (quoting 8 U.S.C. § 1182(d)(5)(A).  In the Government's view, Petitioner must now be treated as he was treated in May 2024 when he first arrived in this country because his parole ended and the Petitioner must be returned "to the custody from which he was paroled."  In other words, the Government argues that Petitioner must be treated as if he was never paroled, and that Petitioner's detention is now mandatory.

Petitioner argues that because he is not an arriving alien and because he was previously paroled into the United States, by the terms of the statute itself he does not fall within the mandatory detention provision of Section 1225(b)(1). Dkt. No. 15 at 2–3. Instead, he argues that, as a result of the termination of his parole, he may be detained only pursuant to the terms of Section 1226(a), the catchall provision for the "apprehension and detention of aliens" under which detention is at the discretion of DHS. Section 1226 is the "default rule that authorizes the Government to detain certain aliens already in the country pending the outcome of removal proceedings." *O.F.B. v. Maldonado*, 2025 WL 3277677, at *4 (E.D.N.Y. Nov. 25, 2025) (quoting *Jennings*, 583 U.S. at 289). Importantly, Section 1226 (unlike Section 1225(b)(1) or (b)(2)) provides for an initial discretionary determination as to whether a noncitizen should be detained or released, and the opportunity for a bond hearing upon detention. 8 C.F.R. § 1236.1(d)(1) (requiring an "initial custody determination," and the opportunity to "request amelioration of the conditions under which he or she may be released").

To address this question, the Court looks to both the plain meaning of the relevant terms, and the "fundamental cannon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme." *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000). "A court must interpret the statute as a symmetrical and coherent regulatory scheme and fit, if possible, all parts into an harmonious whole." *Id.* Under Section 1225(b)(1), Qasemi is subject to mandatory detention only if he falls within the categories of noncitizens subjected to expedited removal—that is, if he is either (1) an arriving alien or (2) is described in clause (iii) of that section. The Court addresses each in turn.

First, while Qasemi is an "applicant for admission" within the meaning of Section 1182(d)(5)(A), he is not a noncitizen "arriving in the United States" within the meaning of

Section 1225(b)(1)(A)(i).  Petitioner is an "applicant for admission" because he "has not been

admitted." 8 U.S.C. § 1225(a)(1).  Parole is "not regarded as an admission" to the United States.

8 U.S.C. § 1182(d)(5)(A).  It does not follow, however, that Petitioner is "arriving in the United

States." 8 U.S.C. § 1225(B)(1)(A)(i).  He has already arrived, was paroled, entered, and has now

been present in the United States for over a year.  None of that is changed by the fact that he has

not been formally admitted.

The INA does not itself define the phrase "arriving in the United States."  The Court is

therefore guided by its plain meaning.  *Encino Motorcars, LLC v. Navarro*, 584 U.S. 79, 85

(2018).  Interpreting that phrase is not difficult; it has been elucidated by recent careful opinions

addressing the same question.  *See Rodriguez-Acurio v. Almodovar*, 2025 WL 3314420, at *19–

20 (E.D.N.Y. Nov. 28, 2025); *Coalition for Humane Immigrant Rights v. Noem*, 2025 WL

2192986, at *27 (D.D.C. Aug. 1, 2025).  "Arrive" means "to reach a destination" or "to make an

appearance."  Arrive, Merriam-Webster's Collegiate Dictionary (1996); *see also* Arrive, Oxford

English Reference Dictionary (1996) (defining "arrive," when followed by "in," as "reach a

destination; come to the end of a journey or a specified part of a journey"); *Coalition*, 2025 WL

2192986, at *28.  Put simply, someone arriving in the United States is someone who has reached

the border or a port of entry.  "Moreover, nothing in Section 1225 suggests that 'arriving' is used

as a term of art in the clause, 'an alien . . . who is arriving in the United States . . .'" *Rodriguez-

Acurio*, 2025 WL 3314420, at *20.  "The words 'arriving,' 'arrival,' and 'arrive' in Section 1225

appear to refer to a process that occurs upon physical entry into the United States, 'not an

interminable . . . status' that attaches to a noncitizen upon arrival." *Id.* (quoting *Coalition*, 2025

WL 2192986, at *27).  In that respect, it differs from the term "applicant for admission," which

describes a status that does not conclude until the non-citizen is formally admitted.  Applying the

plain meaning of "arriving in the United States" here, there can be no doubt that upon his parole into the interior of the country, Qasemi had arrived in the United States and was no longer a noncitizen arriving in the United States. It would try any plain understanding of the term arrival to classify an individual like Qasemi who has lived and worked in the United States for over a year prior to his re-detention as an arriving alien.

The plain meaning of the phrase is confirmed by the statutory context as well. Section 1225(b)(1) is titled "Inspection of aliens arriving in the United States and certain other aliens who have not been admitted or paroled." 8 U.S.C. § 1225(b)(1). The statute contemplates that those arriving, i.e. those who appear at the border or a port of entry, must be inspected and screened. The same is not true for those who, like Qasemi, are already present—termination of parole is not accompanied by any renewed inspection or screening. *See Walizada v. Trump*, 2025 WL 3551972, at *11 (D. Vt. Dec. 11, 2025). The Government does not argue, nor does the statute anywhere support, that Qasemi would be required to undergo a new "credible fear" interview upon the termination of his parole. That would be incongruous with Qasemi's ongoing Section 240 proceedings, which the Government "has not moved to dismiss," and has admitted it could not dismiss in the context of this action. Dkt. No. 11 at 9. The provisions applying to "arriving aliens" thus logically apply just to those noncitizens upon their presentation at the border of the United States.

This conclusion comports too with this Court's understanding of Section 1225(b)(2) of the INA, which provides for the treatment and mandatory detention of "other aliens" not subject to expedited removal who are "seeking admission." In *Tumba v. Francis*, 2025 WL 3079014 (S.D.N.Y. Nov. 4, 2025), the Court held that a noncitizen already physically present in the United States, irrespective of whether they presented themselves at the border, does not qualify

as "seeking admission" because they are already in the country.  *Id.* at *3–4.  In reaching that

conclusion, the Court cited to the fact that the DHS has long understood the term "applicant

seeking admission" to be synonymous with "arriving alien."  *Id.* at *4 (citing *Lopez Benitez v.

Francis*, 795 F.3d 475, 489 (S.D.N.Y. 2025)).  If a noncitizen who is physically present in the

United States and who entered the United States without encountering border authorities is not

"seeking admission," and an applicant "seeking admission" is similarly positioned to one

arriving, it necessarily follows that a noncitizen paroled into the country—*i.e.*, a noncitizen

residing in the United States—is not an arriving alien.  A contrary conclusion would lead to a

senseless outcome; the noncitizen like Qasemi who is present and entered the country through a

lawful process would still be "arriving" in the country, whereas one who entered without any

inspection or without any process whatsoever would not.  *See Aviles-Mena v. Kaiser*, 2025 WL

2578215, at *5 (N.D. Cal. Sept. 5, 2025).

    8 C.F.R. § 1.2 defines an "arriving alien" as "an applicant for admission coming or

attempting to come into the United States at a port-of-entry," and states that "[a]n arriving alien

remains an arriving alien even if paroled pursuant to section 212(d)(5) of the Act, and even after

any such parole is terminated or revoked."  The Second Circuit relied on that regulation, in part,

in *Ibragimov v. Gonzalez*, 476 F.3d 125, 129 (2d Cir. 2007).  But that does not change the

Court's analysis.  The Government does not rely upon 8 C.F.R. § 1.2 or *Ibragimov,* for good

reason.  The Court is interpretating a statute, not a regulation.  In addition, the regulation does

not purport to define the relevant phrase in this statute.  Section 1225(b)(1)(A)(i) uses the phrase,

"an alien who is arriving in the United States," not "arriving alien," *See* 8 U.S.C. §

1225(b)(1)(A)(i).  There are other sections of Title 8 that refer to an "arriving alien," *see, e.g., id.*

§§ 1225(c)(1), 1182(a)(9)(A)(i), but not Section 1225(b)(1)(A)(i).  Finally, the question in

*Ibragimov* was whether a noncitizen who entered the country on "advance parole" under 8 C.F.R. § 245.2(a)(4) was an "applicant for admission" after his application for adjustment of status was denied and he was subject to exclusion proceedings. *Ibragimov*, 476 F.3d at 129. The Circuit determined that "valid and unambiguous INS regulations governing the grant of advance parole" meant that the petitioner was "properly treated as an arriving alien and applicant for admission in removal proceedings once his adjustment of status application was denied." *Id.* The Circuit did not interpret the phrase "alien arriving in the United States," nor did it interpret the text of the INA at all. Instead, it explained only that the result was commanded by the text of the regulation itself. It specifically noted that the petitioner did not make an argument that the "INS regulations reflect an impermissible interpretation of the parole statute," but went on to reject that hypothetical argument on the basis of deference under *Chevron U.S.A., Inc. v. NRDC*, 467 U.S. 837 (1984). *Ibragimov*, 476 F.3d at 137 n.17. Noting that the parole statute is "silent on the question of what status should be accorded to advance parolees who have previously overstayed their visas," it determined only that the INS regulations were "not arbitrary, capricious, or manifestly contrary to the intent of Congress, and therefore are entitled to deference of the courts." *Id.*

Second, Petitioner does not fall within the other category of noncitizens subject to mandatory detention under Section 1225(b)(1)—those described under subsection (b)(1)(iii)(II) of Section 1225. Subsection (b)(1)(iii)(II) explains that mandatory detention applies to a noncitizen who (1) "has not been admitted or paroled into the United States" or (2) "has not affirmatively shown, to the satisfaction of an immigration officer, that [he] has been physically present in the United States continuously for the 2-year period immediately prior to the date of the determination of inadmissibility." 8 U.S.C. § 1225(b)(1)(iii)(II). Removing the negative, the

statute states that if a noncitizen has *either* been "admitted or paroled," or has been continuously in the United States for "a two-year period prior to a determination of inadmissibility," the noncitizen is not subject to expedited removal (and the accompanying mandatory detention regime of Section 1225(b)(1)).

Petitioner has not been present in the United States for two years, but he has been paroled into the United States.  Accordingly, he cannot be detained under subsection (iii) of Section 1225(b)(1).  That conclusion follows from the plain text of the statute.  The phrase "who has not been . . . paroled into the United States" exempts noncitizens who are both presently on parole and those who were paroled in the past.  As Judge Choudhury explained in *Rodriguez-Acurio*, "the statutory text does not read that a noncitizen is eligible for expedited removal if that person 'is not currently on parole.'  Instead, it ties the ability to be designated for expedited removal to whether the noncitizen 'has not been . . . paroled,' leaving open the possibility that 'whether a noncitizen's parole is active, or has expired or been terminated, does not matter.'"  2025 WL 3314420, at *15 (quoting *Coalition*, 2025 WL 2192986, at *22).

As a technical matter, the present perfect tense used in the statute ("has not been") "can refer to either (1) 'an act, state or condition that is *now* completed,' or (2) 'a past action that comes up to and touches the present.'"  *Hewitt v. United States*, 606 U.S. 419, 428 (2025) (quoting The Chicago Manual of Style § 5.132, p. 268 (17th ed. 2017)).  In discussing the use of that tense as used in the First Step Act, the Supreme Court illuminated the distinction between the two possible meanings of that tense with two examples.  First, it posited that a rule stating that "athletes may call themselves Olympic champions if a gold medal has been awarded to them" is clear that the "historical event triggers the rule's proper application, because it gives rise to the inference that the athlete remains an Olympic gold medalist at present, thereby justifying

her continued use of the Olympic champion title." *Id.* at 428.  To the contrary, if that hypothetical athlete had been "stripped" of her medal because it was obtained with the help of "performance-enhancing drugs during the competition" such that its award was not valid in the first instance, no such medal "has been awarded to them." *Id.* at 429.  The Court used the example to show that "[w]hen used in this way, the present-perfect tense conveys to a listener that the event in question continues to be true or valid." *Id.*  The Supreme Court applied that logic to the First Step Act's instruction that it applies only "if a sentence for the offense has not been imposed," and determined that a sentence that is later vacated is not one that has been imposed because it is void, just as the drug-using Olympian's medal.  *Id.* at 440.

By that logic, the INA's use of the term "paroled" in the phrase "has not been admitted or paroled" includes those who were previously validly and legally paroled, but whose status has come to its legal conclusion.  No party here contests that Qasemi's parole was validly awarded. It was not procured through fraud or other undue means.  "The termination of parole, unlike vacatur of a sentence [as in *Hewitt*], does not render that parole 'void ab initio.'" *Coalition*, 2025 WL 2192986, at *23.  Qasemi is not positioned similarly to the hypothetical Olympian whose medal was incorrectly awarded in the first instance and so could not be considered to have been awarded one.  To the contrary, he sits comfortably within the category of noncitizens who were granted parole on the basis that they were neither a flight risk nor danger to the community, even if that status came with an end date.  His status of as a parolee was not "voided by a subsequent action," it simply came to its predetermined end.  *Id.*

As much is confirmed by the context of the phrase and its verb tense as used in the INA. Where Congress wanted to describe a group of noncitizens according to a status or an attribute they possessed at the specific moment in time at which they were evaluated, it used the present

tense.  For example, only an alien who "is a stowaway is not eligible to apply for admission."  8

U.S.C. § 1225(a)(2).  Congress did not there intend to make ineligible a person who had at any

time been a stowaway, and therefore specified that the ineligible group is specific to present

stowaways.  Similarly, only aliens who "are applicants for admission . . . shall be inspected by

immigration officers."  *Id.* § 1225(b)(3).  Someone who might have previously been an applicant

for admission, but is no longer, would not need such an inspection.  *See also id.* § 1225(b)(2)(B)

(section does not apply to an alien "who is a crewman," or "who is a stowaway").  Had Congress

intended for subsection (b)(1)(iii) to apply only to those currently on parole, it would have used

"is paroled"; it used that verb tenses elsewhere in the same statute.  The choice to use "has not

been admitted or paroled" is thus most naturally read to sweep in both those who were paroled in

the past and who are presently paroled.

This conclusion is further supported by the surrounding terms.  *See Smith v. United*

*States*, 508 U.S. 223, 229 (1993) ("The meaning of a word that appears ambiguous if viewed in

isolation may become clear when the word is analyzed in light of the terms that surround it.").

"Paroled" is used alongside "admitted," which refers only to historical fact and manner of entry.

*See Sanchez v. Mayorkas*, 593 U.S. 409, 415 (2021) ("lawful status and admission . . . are

distinct concepts in immigration law.").  "Accordingly, the clause 'admitted or paroled' does not

refer to a legal status but rather to the event of entry into the United States via admission or

parole, which either did or did not occur."  *Rodriguez-Acurio*, 2025 WL 3314420, at *16.  The

use of the word "into" similarly "conveys entrance inside of a location, rather than a status."  *Id.*

"Whereas other forms of parole are more akin to 'bail release' during the time period in which

'removal is actively sought,' a person paroled under Section 1182(d)(5)(A) is temporarily

'authorized to come into the United States.'"  *Id.* (first quoting *Cruz-Miguel v. Holder*, 650 F.3d

189, 198 (2d Cir. 2011); then quoting *United States v. Balde*, 943 F.3d 73, 84 (2d Cir. 2019)).

"As a result, such persons are lawfully present in the United States even as they 'do[ ] not change

. . . immigration status' and have not been admitted."  *Id.* (quoting *Balde*, 943 F.3d at 84).

Looking to the section as a whole, the Government's reading is not only contrary to the

plain text but would also lead to unnecessary surplusage.  "[C]ourts should avoid statutory

interpretations that render provisions superfluous."  *United States v. Dai*, 99 F.4th 136, 139 (2d

Cir. 2024).  By its understanding, a noncitizen who has been paroled nevertheless retains their

status as one "arriving in the United States."  Dkt. No. 11 at 11.  If that were true, subsection (iii)

would have no meaning.  Under Section 1225(b)(1), if a noncitizen is an "arriving" alien, "or is

described in clause (iii)," they fall within the expedited removal provision (and accompanying

mandatory detention).  Clause (iii) applies if the noncitizen has been admitted or paroled, or

physically present for two or more years.  If it were true that a paroled person was *always* treated

as an arriving alien, the word parole in clause (iii) is entirely superfluous, because the paroled

noncitizen would always fall within the expedited removal provision on account of their status as

an arriving alien.  Congress could not have intended a term it specifically included to be written

out by a different term, especially where the other term is better understood to have a narrower

meaning.

The statute is therefore most sensibly read to exclude from the expedited removal

provisions in Section 1225(b)(1) those noncitizens who were admitted to the United States, were

at any time paroled into the United States, or who resided in the United States for over two years.

As to each of those three groups, the noncitizen has established a presence in the country, and in

each instance then Congress made the decision that they should be subject to the standard

removal procedures enshrined in Section 240—not the expedited provisions in Section

1225(b)(1).  And if the noncitizen does not fall within the provision that serves as a gateway for expedited removal (regardless the cases takes the path of expedited removal or a 240 hearing), the noncitizen is not subject to the mandatory detention regime applicable to all those who fit within the gateway's criteria.  Thus, when ICE affirmatively chose to release Qasemi on parole, it made the decision that he would no longer be subject to the mandatory detention provision of Section 1225(b)(1), as is mandated by subsection (b)(1)(iii)(II).

The Government's remaining argument to the contrary rests upon the language of 8 U.S.C. § 1182(d)(5)(A) that upon termination of parole the noncitizen "shall forthwith be returned to the custody from which he was paroled."  The Government argues that, by virtue of that language, even if Qasemi would not otherwise have been subject to mandatory detention under Section 1225(b)(1), he is subject to it now because prior to being paroled in the first instance, he was subject to mandatory detention under that provision.  The language of Section 11182(d)(5)(A) does not do what the Government hopes it does for several reasons.

First, that result is not mandated by the text of Section 1182(d)(5)(A).  The provision does *not* state that a noncitizen is returned to the "status" they held upon their parole, that they revert to status as an "arriving alien," or that they must be detained.  "Rather, the provision says that two things happen to a noncitizen following expiration of parole: (1) he 'shall forthwith return or be returned to the custody from which he was paroled'; and (2) 'thereafter his case shall continue to be dealt with in the same manner as that of any other applicant for admission to the United States.'"  *Coalition*, 2025 WL 2192986, at *24 (quoting 8 U.S.C. § 1182(d)(5)(A)).

On the first, the instruction that the noncitizen be "returned to the custody from which he was paroled" does not mean a return to physical custody.  The law and the statute draw a distinction between "detention" and "custody."  "Custody" does not necessarily mean physical

custody.  It concerns any status under which a person or thing is under "the care and control of [another] for inspection, preservation or security."  *Black's Law Dictionary* 390 (7th ed. 1999).  That contrasts with "detention" or "detain," which Congress uses frequently.[5]  When "custody" is intended to denote detention, it is preceded by the modifier "physical," or "in."  For example, as the Supreme Court has held, an incarcerated person placed on parole is in the "custody" of the parole board, even if he is not subject to its "actual, physical custody."  *Jones v. Cunningham*, 371 U.S. 236, 239–40 (1963).  "Custody" used alone refers to "restraints on a man's liberty, restraints not shared by the public generally."  *Id.*; *see also Khabazha v. ICE*, 2025 WL 3281514, at *3 (S.D.N.Y. Nov. 25, 2025) (For the purposes of "custody" in the habeas statute, 28 U.S.C. § 2241, the custody requirement "may be satisfied by restraints other than 'actual, physical custody' incarceration.'" (quoting *Vega v. Schneiderman*, 861 F.3d 72, 74 (2d Cir. 2017))).  Nor could custody mean physical custody in Section 1182(d)(5)(A), as the statute does not of its own form "affirmatively authoriz[e] detention, much less indefinite detention."  *Clark v. Martinez*, 543 U.S. 371, 385 (2005).

A noncitizen in asylum proceedings who is returned to the custody from which he was paroled loses the freedoms associated with parole status and is once again subject to the same constraints on liberty that apply to any noncitizen in removal proceedings without parole.  A paroled noncitizen is not subject to discretionary detention and is at liberty so long as they abide by "reasonable conditions (such as periodic reporting of whereabouts)" that may be imposed.  8 C.F.R. § 212.5(d)(3).  They can enjoy "all of the privileges of a free man with the permission of

---

[5] In *Jennings*, the Supreme Court pointed to dictionary definitions clarifying that to "detain" is to "keep in confinement or under restraint; to keep prisoner," or "to keep in custody; confine," or "the act or fact of holding a person in custody; confinement or compulsory delay."  583 U.S. at 307–08 (internal citations omitted).  Those definitions are clear that detention is physical custody, or custody with an element of actual confinement.

the government," and "acquire[] a liberty interest under the Due Process Clause." *Rojas v. Almodovar*, 2025 WL 3034183, at *7 (S.D.N.Y. Oct. 30, 2025). That freedom is "not unlimited," but includes "the core values of unqualified liberty" such that "its termination calls for some orderly process." *Id.* (quoting *Morrissey v. Brewer*, 408 U.S. 471, 482 (1972)). A noncitizen who is paroled "(1) may be eligible to access certain Federal public benefits (if paroled into the United States for a period of at least one year), 8 U.S.C. §§ 1611(1), 1641(b)(4); (2) can apply for adjustment of status under 8 U.S.C. § 1255(a); and (3) can seek employment authorization, 8 C.F.R. § 274a.12(c)(11)." *Rodriguez-Acurio*, 2025 WL 3314420, at *11 (citing *Cruz-Miguel*, 650 F.3d at 198).

A noncitizen whose parole has expired or been revoked loses those freedoms.[6] He is restrained from working for a wage and from applying for Federal public benefits. Most important, without parole status, he is subject to detention even if he has not been accused of, arrested for, or committed a crime, so long as the Government determines that he presents a flight risk or a danger to the community. *See* 8 C.F.R. § 236.1(c)(8). Those are all freedoms enjoyed by the public generally but not enjoyed by a person such as Qasemi who is applying for admission to the United States but has not yet been admitted. It is this "custody" that Section 1182(d)(5)(A) contemplates a noncitizen must be returned to following termination of their parole. In other words, under Section 1182(d)(5)(A), the day after a noncitizen's parole status is terminated, under the INA that noncitizen is in the exact same position they were the day before,

---

[6] Parole can only be terminated in accordance with the applicable statue and regulations. It terminates without notice upon "the departure of the alien from the United States," or "at the expiration of the time for which parole was authorized," and "upon written notice" to the noncitizen otherwise. 8 C.F.R. § 212.5(e). "Revocation of parole under DHS' own rules requires a case-by-case assessment to comply with the statute, and must attend to the reasons an individual received parole initially." *Rojas*, 2025 WL 3034183, at *8 (internal citations omitted).

except that they no longer have parole status and the freedoms associated with it.  The statute does not require the Court to pretend that Qasemi was never paroled and permitted to live freely in this country.  A noncitizen is not reverted by operation of law to status as an arriving alien— they remain a noncitizen living in the United States who used to be paroled and must be treated by the INA accordingly.

The Court's conclusion that a return to "custody" does not mandate a return to physical custody is also necessary by reference to the statute of a whole.  Section 1225(b)(1)(A)(iii)(II) expressly exempts from the ambit of the mandatory detention scheme one who has been paroled.  Understanding Section 1182(d)(5)(A) to nevertheless require someone who has been paroled to be detained pursuant to Section 1225 would render that portion of the statute entirely illusory; there is no indication Congress intended the instruction in Section 1182 to automatically override other portions of the same statute.  Courts are "reluctan[t] to treat statutory terms as surplusage." *Bd. of Trs. of Leland Stanford Junior Univ. v. Roche Molecular Sys., Inc.*, 563 U.S. 776, 788 (2011) (quoting *Duncan v. Walker*, 533 U.S. 167, 174 (2001)).  That is particularly so where there is a construction of the text that renders them "compatible, not contradictory."  *Brown & Williamson Tobacco Corp.*, 529 U.S. at 133.  Here, reading Section 1182(d)(5)(A) to require return to the custody of the DHS rather than mandatory physical detention resolves any theoretical surplusage.

On the second portion of Section 1182(d)(5)(A), that the case "shall continue to be dealt with in the same manner as that of any other applicant for admission," this Court has previously explained that an "applicant for admission" is a noncitizen who "has not been formally admitted to the United States," and the term "doesn't require an application of any sort;" it applies to all those "presen[t] without admission."  *Tumba*, 2025 WL 3079014, at *3 (internal citation

omitted).  To that end, in *Clark*, the Supreme Court explained that the phrase indicates that the

noncitizen is therefore subject to the otherwise relevant provision of the INA.  543 U.S. at 727

(applying the default provision to an alien ordered removed, 8 U.S.C. § 1231(a)(6), after the

noncitizen's parole terminated).  "Thus, Section 1182(d)(5)(A) suggests that rather than reverting

to any prior status, a noncitizen whose parole has expired is treated like the vast majority of

undocumented immigrants currently living in this country who are not subjected to expedited

removal."  *Rodriguez-Acurio*, 2025 WL 3314420, at *17.

Putting these pieces together, the termination by expiration of Qasemi's parole returned

him to the "custody" of DHS pursuant to the INA.  Because he was paroled, and because he is

not an arriving alien, he is no longer subject to the mandatory detention provision of Section

1225(b)(1).  The outcome of this textual analysis is ultimately simple: absent ongoing parole

status, Section 1182 mandates that Qasemi be treated just as the INA would treat any noncitizen

previously granted parole and living in the United States.  Every court that this Court is aware of

that has considered the question has determined the same.  *See also Singh v. Albarran*, 2025 WL

3640678, at *2 (E.D. Cal. Dec. 16, 2025); *Walizada*, 2025 WL 3551972, at *11; *Rodriguez v.

Rokosky*, 2025 WL 3485628, at *2 (D.N.J. Dec. 3, 2025); *Salgado Bustos v. Raycraft*, 2025 WL

3022294, at *6 (E.D. Mich. Oct. 29, 2025); *E.V. v. Raycraft*, 2025 WL 2938594, at *3 (N.D.

Ohio Oct. 16, 2025); *Espinoza v. Kaiser*, 2025 WL 2675785, at *5 (E.D. Cal. Sept. 18, 2025);

*Munoz Materano v. Arteta*, 2025 WL 2630826, at *11 (S.D.N.Y. Sept. 12, 2025); *Aviles-Mena v.

Kaiser*, 2025 WL 2578215, at *4 (N.D. Cal. Sept. 5, 2025); *Make the Road N.Y. v. Noem*, 2025

WL 2494908, at *4 (D.D.C. Aug. 29, 2025).

Therefore, any determination as to Qasemi's detention must be conducted under the

discretionary framework of Section 1226(a), which "governs the process of arresting and

detaining noncitizens who have already entered the United States pending their removal."
*Tumba*, 2025 WL 3079014, at *3 (quoting *Jennings*, 583 U.S. at 288).  That describes Qasemi,
who is undoubtably within the United States pending the adjudication of his asylum claim.

That the INA treats a noncitizen like Qasemi under Section 1226(a) rather than Section
1225(b)(1) avoids potentially absurd outcomes.  "It is, to be sure, well-established that 'a statute
should be interpreted in a way that avoids absurd results."  *Gibbons v. Bristol-Myers Squibb Co.*,
919 F.3d 699, 705 (2d Cir. 2019).  The notice issued to Petitioner informed him when his parole
would end but did not inform him that the consequence of the ending of his parole was that he
should "return" or he would be "returned" to custodial detention.  It also did not tell him where
he should "return" to at that time.  Yet, under the Government's view, a person who was paroled
into the United States upon a finding that he did not present a danger or a risk and who continued
not to present a danger or a risk, would upon its automatic termination be forever at risk of being
arrested at any time, in any place, and for any reason, with no notice and no recourse.  It is "quite
impossible that Congress would have intended" this result, *id.*, particularly because greater
protections are afforded to noncitizens who entered the country without inspection.  Under
Section 1226(a), a noncitizen who has bypassed the border entirely and is encountered within the
interior of the country is evaluated by DHS for potential release on their own recognizance, and
if detained is provided with the opportunity for a bail hearing.  8 C.F.R. § 1236.1(d)(1); *see
Tumba*, 2025 WL 3079014, at *2.  The Government's argument is that because Qasemi made an
appointment at the border and followed a legal process for his entry into the United States, he
must be treated with less process than a noncitizen who got past the border and was apprehended
by border patrol soon after their crossing.  It is far more sensible to understand the termination of

parole as resulting in the termination of the benefits that accompany it, and not as resulting in automatic re-detention.

Indeed, until Qasemi filed his habeas petition, the Government itself did not understand him to be subject to mandatory detention under Section 1225(b)(1), because the warrant upon which he was arrested expressly invoked the authority of Section 1226. *See* Dkt. No. 9-5. The warrant was issued "pursuant to" section 236 of the INA (8 U.S.C. § 1226). *Id.* As this Court noted in *Tumba*, although the Government has not argued that "they changed the basis upon which Petitioner was released into the United States at some point . . . [i]f they had argued as much, that too would raise significant due process concerns." 2025 WL 3079014, at *5 n.3 (citing *Obeya v. Sessions*, 884 F.3d 442, 445 (2d Cir. 2018)).

Any other interpretation of Sections 1225(b)(1)(B) and 1182(d)(5)(A) would also raise significant constitutional issues. *See Jennings*, 583 U.S. at 298 (2018) (the constitutional avoidance doctrine permits a court to choose "'between competing plausible interpretations of a statutory text'" (quoting *Clark,* 543 U.S. at 381)); *see also Zadvydas v. Davis*, 533 U.S. 678, 699 (2001) ("interpreting the statute to avoid a serious constitutional threat, we conclude that, once removal is no longer reasonably foreseeable, continued detention is no longer authorized by statute."). Noncitizens living in the United States enjoy the protection of the Due Process Clause. *Zadvydas*, 533 U.S. at 693; *Wong Wing v. United States*, 163 U.S. 228, 238 (1896). That is no less true for a noncitizen living in the United States who has not been either admitted or excluded from the country. *Rojas*, 2025 WL 3034183, at *5. For those noncitizens, then, it remains true that "[i]n our society liberty is the norm." *United States v. Salerno*, 481 U.S. 739, 755 (1987). "Freedom from imprisonment—from government custody, detention, or other forms of physical restraint—lies at the heart of the liberty that Clause protects." *Zadvydas*, 533 U.S. at

690.  The Government may detain a person arriving in the United States without documentation to "giv[e] immigration officials time to determine an alien's status without running the risk of the alien's either absconding or engaging in criminal activity before a final decision can be made." *Jennings*, 583 U.S. at 286.  But in a free society, a member of law enforcement cannot simply imprison a person without reason and detain her indefinitely.  It is not enough that the Government have the power to arrest someone.  The Government also must have some justification before it deprives a person protected by the Due Process Clause of her liberty.  *See Zadvydas*, 533 U.S. at 690; *Salerno*, 481 U.S. at 750–51 (right to liberty "may, in circumstances where the government's interest is sufficiently weighty, be subordinated to the greater needs of society"); *Addington v. Texas*, 441 U.S. 418, 425 (1979) ("This Court repeatedly has recognized that civil commitment for any purpose constitutes a significant deprivation of liberty that requires due process protection"); *cf. Mathews v. Eldridge*, 424 U.S. 319, 348 (1976) (the "essence of due process is the requirement that 'a person in jeopardy of serious loss be given notice of the case against him and opportunity to meet it.").

The Government's expansive interpretation of Sections 1182(d)(5)(A) and 1225(b)(1)(B) would do exactly what the Due Process Clause has long been understood to prohibit.  That perverse outcome is not the best reading of the statute.  Congress judged that persons who arrive at the border without documents are not categorically ineligible for release.  It gave immigration officers the authority on a "case-by-case basis" to release a person arriving without documents into the community "for urgent humanitarian reasons or significant public benefit" where that person presented neither a risk of flight nor a danger to the community.  8 U.S.C. § 1182(d)(5)(A).  The immigration officers exercised that authority in the case of Qasemi, as they have over the decades in the cases of numerous other individuals.  *See Biden v. Texas*, 597 U.S.

785, 814–15 (2022) (Kavanaugh, J. concurring) ("Notably, every administration beginning in the late 1990s has relied heavily on the parole option, including the administrations of Presidents Clinton, Bush, Obama, Trump, and Biden.").

DHS released Qasemi into the country for a period of one year. There is no evidence that the CBP officer based the one-year parole period on any determination that the risk-reward calculus would change after one year. Nor has any Government official with authority articulated that the humanitarian reasons and public benefit that supported Qasemi's release no longer exist. And the Government explicitly forswears any obligation to show that Qasemi presents a danger to the community or risk of flight. Nor is it likely that the Government could do so—Qasemi has led a law-abiding life. He has made every appearance required of him by the immigration court and USCIS, even when it would have been apparent that his appearance might have led to his arrest.[7] Yet, under the Government's view, it had the right to arrest and detain Qasemi even if doing so would serve no governmental interest—which it conceded it could not at the hearing on this Petition. Its argument cannot be reconciled with the notion that even a person living in the United States without documents enjoys the right to due process.

Having established that Qasemi's present detention is governed by Section 1226(a) rather than Section 1225(b)(1), there can be no remaining question whether his detention is valid under the INA. It is not. As this Court has explained, discretionary detention under the ambit of Section 1226(a) requires the exercise of discretion. Where there is no evidence or argument that such discretion was exercised, detention under that subsection is illegal.

> Considering the complete absence of any reason for Petitioner's arrest under Section 1226, either in the record or in the briefing, this Court cannot conclude that

---

[7] The Government did not argue that Qasemi's failure to attend a virtual check in was the basis for a new finding that he was either a flight risk or danger to the community. There was no contemporaneous communication regarding that appointment at the time. Qasemi Decl. ¶ 25.

her violent re-detention is compliant with the mandates of the Due Process Clause. Tumba does not argue that she could not be detained under 8 U.S.C. § 1226 pending the adjudication of her claim for asylum—only that before the Government does so, it must make a discretionary determination that she [] presents a risk of flight or danger to the community. *See Valdez v. Joyce*, 2025 WL 1707737, at *3 (S.D.N.Y. June 18, 2025) ("[T]he issue here is not the permissibility of immigration detention, but rather the process required in connection with such detention."). "[T]reating attendance in immigration court as a game of detention roulette is not consistent with the constitutional guarantee of due process." *Lopez Benitez*, 2025 WL 2371588, at *15. And the "suggestion that government agents may sweep up any person they wish, for [no] reason [whatsoever] . . . so long as the person will, at some unknown point in time, be allowed to ask some other official for his or her release offends the ordered system of liberty that is the pillar of the Fifth Amendment." *Chipantiza-Sisalema v. Francis*, 2025 WL 1927931, at *3 (S.D.N.Y. July 13, 2025).

*Tumba*, 2025 WL 3079014, at *7. In the instant proceeding, the Government could not point to any exercise of discretion that determined Qasemi was a flight risk or posed a danger to the community, and could not offer a single other reason why Petitioner was detained, or why it would have been in the public interest for DHS to do so. At present, Petitioner is scheduled for a consolidated asylum hearing with members of his family in February 2026. That hearing presumably will determine whether he and his family members have a well-founded fear of persecution and are entitled to remain in this country or not. There is no reason—apart from the Government's assertion that it can detain Qasemi—that those proceedings should not run their course in their intended fashion with Petitioner permitted to remain in this country at liberty if the law gives him that right and removed from this country if the law denies him that right. If not, after exhausting appeals, Qasemi may be removed from this country.[8]

---

[8] Petitioner has also submitted a declaration from a former immigration judge with the Executive Office for Immigration Review who has clarified that noncitizens detained in Delaney Hall have their cases heard by the New Jersey immigration courts. Dkt. No. 18-4. It therefore seems likely that regardless of whether the Government has filed a motion to de-consolidate or not, Dkt. No. 17, Qasemi's case could not proceed along with his family members were he to retain in detention. The Government has provided no information as to whether a distinct asylum hearing date has been set.

### III.    Remedy

This Court has previously addressed the appropriate remedy where a noncitizen is improperly detained pursuant to Section 1226 without the required process.  Although Petitioner would "undoubtably be entitled to a bond hearing pursuant to 8 U.S.C. § 1226" if his initial detention was legal, the Government's violation of Petitioner's right to due process "originated with [his] detention in the first instance." *Tumba*, 2025 WL 3079014, at *7.  Although it has not offered such an argument here, any argument that Qasemi should be required to first pursue such a bond hearing is accordingly inapposite; it would "provide no genuine opportunity for adequate relief." *Beharry v. Ashcroft*, 329 F.3d 51, 62 (2d Cir. 2003).

Qasemi seeks the "typical remedy" for "unlawful executive detention," which "is, of course, release." *Munaf v. Green*, 553 U.S. 674, 693 (2008).  "[T]he traditional function of the writ is to secure release from illegal custody"; it is the "usual remedy by which a man is restored again to his liberty, if he ha[s] been against law deprived of it." *Preiser v. Rodriguez*, 411 U.S. 475, 484 (1973) (internal citation omitted).  The Court has determined that the Government violated Petitioner's procedural due process rights, and he is therefore entitled to release. *See Tumba*, 2025 WL 3079014, at *8–9; *Rodriguez-Acurio*, 2025 WL 3314420, at *32.

### CONCLUSION

The petition for a writ of habeas corpus is GRANTED.  Respondents are ORDERED to immediately release Qasemi from custody by 2:00 p.m. on December 18, 2025, and certify

compliance with the Court's order by filing an entry on the docket by the end of the day.[9]

The Clerk of Court is respectfully directed to close the case.


SO ORDERED.

Dated: December 17, 2025
New York, New York
_____
LEWIS J. LIMAN
United States District Judge

---

[9] In addition to docketing this Order, the Court is emailing it to the Parties on the evening of December 17, 2025.